IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MINDY LYNN BATES, | ) | Case No. 5:26-cv-00152-RJS |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | REUBEN J. SHEPERD |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Mindy Lynn Bates ("Bates"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to follow regulations and reach a conclusion supported by substantial evidence, I vacate the Commissioner's final decision denying Bates' application for SSI and remand her case to the Agency for further consideration.

## II. Procedural History

Mindy Bates filed for SSI on January 12, 2024, alleging a disability onset date of December 31, 2004. (Tr. 17). The claims were denied initially and upon reconsideration. (*Id.*). She then requested a hearing before an ALJ. (*Id.*). Bates (represented by counsel) and a vocational expert ("VE") testified before the ALJ on April 17, 2025. (*Id.*). On May 5, 2025, the

ALJ issued a written decision finding Bates not disabled. (Tr. 34). The Appeals Council denied her request for review on November 26, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Bates timely filed this action on January 21, 2026. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Mindy Bates was 43 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 32). She graduated from high school. (*See id.*). The ALJ determined that Bates had no relevant past work experience. (*See id.*).

### B. Relevant Medical Evidence

On October 6, 2022, Bates established care with Nikita Hedge, M.D. (Tr. 409). Dr. Hedge noted Bates' history of rheumatoid arthritis, and Bates reported right shoulder pain, swelling in her hands, and morning stiffness that lasted for 30 minutes. (*Id.*). On examination, Dr. Hedge added that Bates appeared well, alert, comfortable, and in no acute distress, and that her motor function was "[n]ormal; including tone, gait, stressed gait, power and coordination." (Tr. 413-14). Bates was ambulating with a cane. (Tr. 414). Dr. Hedge assessed Bates with rheumatoid arthritis, high risk medication use, fibromyalgia, a vitamin D deficiency, and a BMI between 45.0 and 49.9, but added that the exam found no active inflammatory arthritis. (*Id.*). Dr. Hedge continued leflunomide 20 mg daily and vitamin D 1000 units daily and discussed at length joint pain and the differences between degenerative arthritis, fibromyalgia, and rheumatoid arthritis. (*Id.*).

Bates again met with Dr. Hedge on April 13, 2023, for a follow-up telemedicine visit.(Tr. 391). Bates reported chronic pain in her hands and feet, mild swelling in her hands, and morning

stiffness lasting about 15 to 20 minutes. (*Id.*). Dr. Hedge examined Bates, and noted that she appeared well, alert, comfortable, and in no acute distress. (Tr. 395). Dr. Hedge again noted Bates' motor function as "[n]ormal; including tone, gait, stressed gait, power and coordination," and she was ambulating with a cane. (*Id.*). Dr. Hedge continued leflunomide 20 mg daily and vitamin D 1000 units daily, and ordered ultrasounds of the hands and feet as well as blood work every three months. (Tr. 397).

On September 15, 2023, Bates established care with Diana L. Wolf, LPCC-S, at Natura Behavioral Health, for behavioral therapy. (Tr. 724). Bates reported having depression, anxiety, bipolar disorder, and ADD. (*Id.*). On examination, Bates appeared to be within normal limits, euthymic mood, congruent affect, and exhibited a goal directed thought process. (Tr. 728). LPCC-S Wolf assessed Bates with bipolar I disorder. (*Id.*).

On September 26, 2023, Bates met with Karen Gade-Pulido, M.D., for an EMG/Nerve Conduction Study to assess for carpal tunnel syndrome. (Tr. 341). Bates reported progressive paresthesias in both hands and stated that she drops things and cannot open jars on her own. (*Id.*). The nerve conduction study demonstrated prolongation of bilateral median sensory distal latencies, slowed conduction velocity, ulnar latency, reduction of the sensory nerve action, and normal ulnar sensory response. (Tr. 342). On examination, Dr. Gade-Pulido noted that Bates appeared in no acute distress. (*Id.*). Bates demonstrated normal strength but had pain with carpal compression at both wrists that extended somewhat into the hands. (*Id.*). A needle examination of Bates' right upper extremity was normal. (*Id.*). A needle examination of Bates' left arm was not conducted since the needle examination was comparable to the electrodiagnostic findings of carpal tunnel. (*Id.*). Bates was advised to schedule carpal tunnel release with a Dr. Stalling after the appointment. (*Id.*).

Dr. Stalling performed carpal tunnel release surgery on Ms. Bates' left hand on November 22, 2023. (Tr. 344-45). During a December 4, 2023 follow up visit with Christopher Boatwright, PA, Bates reported moderate pain and mild swelling in her left hand, but noted that she had no edema or pain in her legs. (Tr. 355). On examination, PA Boatwright noted swelling and tenderness in the hand, but the numbness and tingling were better. (*Id.*). Bates elected to rehabilitate on her own before completing occupational therapy, and PA Boatwright ordered her to complete range of motion exercises and to avoid heavy lifting for 1-2 weeks. (Tr. 356).

On January 2, 2024, Bates met with Darian Roberts, M.D., with complaints of depression. (Tr. 801). Bates reported to being tired all day, struggling to sleep due to pain, and having restless legs. (Tr. 806). On examination, Dr. Roberts noted that Bates was not in acute distress and had normal appearance, found no edema in either leg, but found hives on her arms and legs. (Tr. 808). Dr. Roberts referred Bates to Otolaryngology. (*Id.*).

After the application date, on January 26, 2024, Bates established care with Megan Demos, PMHNP, for medication management. (Tr. 730). Bates reported a history of depression, bipolar disorder, and PTSD, and prescriptions for Depakote DR 125 mg, 2 tabs twice daily, Lamictal 200 mg twice daily, Duloxetine 60 mg PM, and Hydroxyzine 25 mg twice daily as needed, all of which she takes at night. (*Id.*). Bates reports moods going "up and down," with depression and anxiety both at 9/10. (*Id.*). She further reported panic attacks twice a week that accompany PTSD episodes. (*Id.*). Upon examination, mood was sad and depressed, affect was congruent with mood, and insight and judgment were fair. (Tr. 734). NP Demos noted that Bates' diagnoses were inadequately controlled, and would continue to monitor symptoms. (Tr. 736). NP Demos continued Hydroxyzine 25 mg twice daily as needed, increased Cymabala to 60

mg, changed Depakote to ER formulation, and decreased Lamictal to 150 mg due to starting Depakote. (Tr.737).

Three days later, on January 29, 2024, Bates established care with Amanda K Barile, PA-C, at Cleveland Clinic Akron General Arthritis and Rheumatology regarding her history of rheumatoid arthritis. (Tr. 365-66). Bates reported 9/10 pain in her back, morning stiffness lasting 30-45 minutes, and a lack of sleep resulting from the pain. (Tr. 366). On examination, Barile noted that Bates appeared alert, comfortable, and in no acute distress, and that her motor functions were "[n]ormal; including tone, gain, stressed gait, power and coordination." (Tr. 369). Diffuse myofascial tenderness was present, and a tender point exam was positive bilaterally in the suboccipital, low cervical, Trapezius, supraspinatus, gluteal, greater trochanteric, second rib, lateral epicondylar, knee medial fat pad areas. (*Id.*). Barile found no active synovitis during her examination but did assess Bates with rheumatoid arthritis of multiple sites, fibromyalgia, spondylosis of lumbar region without myelopathy or radiculopathy, degenerative arthritis in the lower lumbar spine, disc bulge, and facet arthropathy. (Tr. 371). Barile also noted during her assessment that Bates was not seeing improvement after the left carpal tunnel release. (Tr. 372). Barile ordered Bates to continue seeing pain management and taking leflunomide 20 mg daily, and discussed the importance of adequate sleep, exercise, and a healthy diet. (*Id.*).

On March 11, 2024, Andrew P. Stalker, M.D., conducted a standard polysomnogram on Bates. (Tr. 909). Bates had a sleep efficiency of 57%, with 28 minutes of REM sleep, 25 minutes of slow wave sleep, and 153 minutes of stage II sleep. (*Id.*). Sleep latency was 55 minutes and wake after sleep onset time was 111 minutes. (*Id.*). Dr. Stalker determined there was no significant obstructive sleep apnea, and significantly reduced sleep efficiency in both trouble initiating and maintaining sleep. (Tr. 908). Dr. Stalker recommended that Bates follow up with a

sleep medicine physician to determine what may be contributing to her difficulty sleeping and daytime hypersomnia. (*Id.*).

The next day, March 12, 2024, Dr. Stalker conducted a standard 5-nap protocol in multiple sleep latency test on Bates. (Tr. 906). Dr. Stalker found zero sleep onset REM, and determined the data was suggestive of pathologic hypersomnia, but not narcolepsy. (*Id.*).

On April 25, 2024, Bates met with Dr. Stalling regarding left knee pain. (Tr. 640). Bates reported constant aching in her left knee which worsened after a fall two months earlier. (Tr. 643). Bates reported swelling, popping, clicking, and grinding in her knee, and walking and weight bearing were aggravating factors. (*Id.*). Dr. Stalling found no edema in any extremity, nor effusion in the left knee. (Tr. 644). Dr. Stalling assessed Bates with osteoarthritis and a medial meniscus tear in her knee, and an x-ray revealed mild tricompartmental degenerative joint disease of the left knee with some narrowing of the medial and lateral compartment, along with degenerative change in the patellofemoral joint. (*Id.*). Overall, though, the joint spaces were generally well maintained. (*Id.*).

On May 6, 2024, Bates had a virtual visit with Dr. Hedge regarding her rheumatoid arthritis. (Tr. 668). Bates reported 8/10 pain in her shoulder and neck, stiffness in the morning for about 30 minutes, and continued struggles with fatigue. (Tr. 669). Dr. Hedge recommended Bates continue to see pain management for degenerative arthritis and fibromyalgia, and ordered blood work every three months to monitor medication and disease activity. (Tr. 676).

On May 8, 2024, Bates underwent an MRI of her left knee without contrast to follow up on the medial meniscus tear. (Tr. 1957). The MRI revealed mild subcutaneous edema surrounding the knee, small joint effusion, marrow replacement, chronic joint change, and mild and subtle strains. (Tr. 1957-58).

Bates had a medication management appointment with NP Demos on June 10, 2024. (Tr. 707). Bates reported pain that day from packing for a move, struggling to get enough sleep at night, and that she dozes off. (*Id.*). Bates also reported swelling and pain in her left leg, and tingling in her hands and ankles. (Tr. 708). On examination, Demos noted Bates was appropriately dressed and displayed adequate grooming and hygiene, her gait/station and muscle strength were within normal limits, and she exhibited a sad and depressed mood. (*Id.*). NP Demos diagnosed Bates with bipolar I disorder, unspecified anxiety disorder, and restless leg syndrome, but noted that the diagnoses were fairly controlled at that time. (Tr. 709-10). NP Demos continued to wean Bates off Lamictal 50 mg due to being on Depakote, continued Cymbalta 30 mg from pain management along with the 60 mg Demos prescribed Bates, and continued Depakote ER 1000 mg. (Tr. 711).

On July 8, 2024, Bates again met with NP Demos for a medication management appointment. (Tr. 713). Bates reported that her mood was "all over," expressing that she was depressed every day and her anxiety was "through the roof," and she continued to struggle with sleeping. (*Id.*). Bates added that she "hurt like Hell" from moving into a new house. (*Id.*). On examination, NP Demos noted a sad, depressed and anxious mood, and mood congruent affect, but determined that Bates' conditions were fairly controlled. (Tr. 714-16). NP Demos discontinued Lamictal, continued Cymbalta 30 mg along with the 60 mg already prescribed, and Depakote ER 1000 mg. (Tr. 717). NP Demos discussed the possibility of increasing Cymbalta to 120 mg per day. (*Id.*).

On July 19, 2024, Bates met with Mena Abdelmalak, M.D., at the Columbiana Pain Management Center . (Tr. 944). Bates reported that the pain was constant, describing it as aching, stabbing, and tingling. (*Id.*). On examination, Dr. Abdelmalak noted that Bates appeared

pleasant and in no acute distress, but she raised from a seated position with great difficulty. (Tr. 950). Dr. Abdelmalak did not find tenderness in Bates' abdomen or edema in any extremity, but noted decreased spine range of motion. (Tr. 951). Dr. Abdelmalak further noted an antalgic gait, but no assistive device. (Tr. 952). Dr. Abdelmalak ordered physical or occupational therapy, discontinued tizanidine, started Baclofen 10 mg daily as needed, continued Cymbalta 30 mg daily, and encouraged Bates to exercise and stay active to lose weight. (Tr. 953).

Bates had another medication management appointment with NP Demos on August 12, 2024. (Tr. 757). Bates reported worsening depression and mood since discontinuing Lamictal, continued to struggle with sleeping, depression, and anxiety, and started to struggle focusing and completing tasks. (*Id.*). On examination, NP Demos noted a sad, depressed, and anxious mood, and mood congruent affect, but determined that Bates' diagnoses were fairly controlled. (Tr. 758-60). NP Demos also noted normal gait, station, muscle strength, and muscle tone. (Tr. 758). NP Demos increased Cymbalta to 60 mg twice daily for anxiety and depression, and continued Depokote ER 1000 mg, but would consider increasing it. (Tr. 761). Demos also considered starting Abilify for depression. (*Id.*).

On September 9, 2024, Bates again met with NP Demos for a medication management appointment. (Tr. 1372-73). Bates reported continued struggles with sleep, anxiety, depression, and focus, but now she was having panic attacks and worsening PTSD. (Tr. 1373). On examination, NP Demos noted a sad, depressed, and anxious mood, and congruent affect, but determined that Bates' diagnoses were fairly controlled. (Tr. 1374-75). Bates completed the PHQ-9 and GAD-7 exams, both of which indicated the presence of severe anxiety symptoms. (Tr. 1372). The PHQ-9 revealed that Bates was having problems with interest, mood, sleep, energy appetite, self-esteem, and concentration nearly every day, restlessness more than half the

days, and suicidal ideation or thoughts of self-harm for several days over a two-week period. (*Id.)*. The GAD-7 revealed that Bates was having anxiety, uncontrollable worrying, widespread worrying, trouble relaxing, restlessness, and irritability nearly every day and being afraid of something awful happening for more than half the days over the last two weeks. (*Id.*). NP Demos continued Cymbalta 60 mg BID for anxiety and depression and Depakote ER 1000 mg. (Tr. 1376-77).

A month later, on October 10, 2024, Bates again met with NP Demos for a medication management appointment. (Tr. 1381). Bates reported continued struggles with sleep, anxiety, depression, and focus, and now expressed thoughts about "being better off if [she] wasn't here." (*Id.*). On examination, NP Demos noted a sad, depressed, and anxious mood, with congruent affect, but determined that Bates' diagnoses were fairly controlled, found no evidence of acute risk of harm to self or others. (Tr. 1382-84). NP Demos that Bates' gait and station were impaired, as she was using a cane. (Tr. 1382). NP Demos increased Depakote from 1000 mg to 1500 mg with a plan to increase to 2000 mg at next visit, and continued Cymbalta 60 mg twice daily. (Tr. 1385).

On October 15, 2024, Bates met with LPCC-S Wolf, for a telehealth psychotherapy session. (Tr. 1386). On exam, Wolf noted that Bates appeared to be appropriately dressed, in a tired mood, with congruent affect. (Tr. 1387). The appointment concluded with Wolf encouraging Bates to work on feeling happy 4 out of 7 days. (*Id.*).

Bates had a medication management appointment with NP Demos on November 4, 2024. (Tr. 1389). Bates reported continued struggles with sleep, depression, anxiety, PTSD, and concentration. (Tr. 1389-90). On examination, NP Demos noted a sad, depressed, and anxious mood, and congruent affect, but determined that Bates' diagnoses were fairly controlled, and

found no evidence of acute risk of harm to self or others. (Tr. 1390-92). NP Demos increased Depakote ER from 1500 mg to 2000 mg and continued Cymbalta 60 mg twice daily. (Tr. 1393).

On November 6, 2024, Bates met with Dr. Hedge regarding her rheumatoid arthritis. (Tr. 991). Bates reported 10/10 pain in her left elbow, ankles, and left knee, as well as swelling in her ankles, stiffness for up to an hour, struggles with fatigue, and a lack of improvement from recent trigger point injections. (Tr. 991-92). On examination, Dr. Hedge noted a soft but not tender abdomen, that Bates appeared alert, comfortable, and in no acute distress, and that motor examination was "[n]ormal; including tone, gait, stressed gait, power and coordination." (Tr. 996). Dr. Hedge also noted slight hypermobility in Bates' elbows and knees, and that she was ambulating with a cane. (*Id.*). Dr. Hedge found no evidence for active rheumatoid arthritis and recommended exercise, and continuing blood work every three months. (Tr. 998-99).

On November 11, 2024, Bates established care with Sabrina Barros, PA-C, for pain management related to rheumatoid arthritis and fibromyalgia. (Tr. 984-85). Bates reported neck pain radiating to both forearms, back pain radiating to left thigh, and bilateral knee pain, describing the pain as "10/10." (Tr. 985) Bates further reported numbness and tingling in her ankles and hands, and weakness in her bilateral grip. (*Id.*). She reported no improvement with pain management, though left CT release helped some symptoms. (*Id.*). Bates was able to ambulate and perform activities of daily living without devices, but had to move slowly. (*Id.*). Bates had trialed and failed neuropathic, trigger point injections, and knee corticosteroid injections. (*Id.*).

On examination, Bates had midline tenderness in the cervical spine, in lumbar spine, pain with palpation of left sacroiliac joint, negative straight leg raise, positive FABER, positive distraction test, positive compression test, all on the left. (Tr. 987). PA Barros did not find edema

in either leg. (*Id.*). PA Barros also noted Bates' gait was normal. (Tr. 988). PA Barros suspected nerve impingement, specifically on the left, as well as facet arthropathy. (Tr. 989).

PA Barros ordered a cervical MRI and ordered left sacroiliac corticosteroid injection with fluoroscopy to treat her back pain. (*Id.*). PA Barros also recommended exercise, cognitive behavior therapy, and coping skills, as well as neuropathics and muscle relaxers as needed for pain. (*Id.*). PA Barros prescribed Tizanidine up to 4 mg twice daily and recommended a follow up in 2 months. (*Id.*).

On December 12, 2024, Jagan Devarajan, M.D., gave Bates a sacroiliac joint injection due to her sacroiliac joint dysfunction. (Tr. 1159). Bates tolerated the procedure well and was discharged. (*Id.*).

Bates met with LPCC-S Wolf for a psychotherapy session on December 13, 2024. (Tr. 1403). Bates reported that her narcolepsy interfered with her need for more structure and routine in her day. (*Id.*). Although Bates was feeling more depressed with the approaching holidays, she did report excitement after acquiring a sewing machine on Black Friday. (*Id.*). On examination, Wolf noted that Bates appeared to be dressed appropriately, that she had a sad and depressed mood, and her affect was mood congruent. (Tr. 1403-04). Wolf encouraged Bates to create and implement a daily routine to complete daily tasks but allow time for sewing. (Tr. 1404).

On December 21, 2024, Parvez Masood, M.D., performed an MRI on Bates' cervical spine due to her history of cervical radiculopathy. (Tr. 1029). Dr. Masood found decreased disc height and signal with minimal posterior bulges at C4-5, C5-6, and C6-7 along with facet and uncovertebral joint degeneration indicating cervical disc degeneration and spondylosis. (*Id.).* However, Dr. Masood noted no acute abnormality, and the remaining discs and joint, alignment,

vertebral heigh, marrow signal, soft tissues, central canal, thecal sac, spinal cord signal and posterior fossa were all normal. (*Id.*). There also was no fracture or dislocation. (*Id.*).

Bates had an emergency visit with Steven Davis, M.D., on December 22, 2024, after she fell out of bed that morning. (Tr. 1875). Although she denied hitting her head, Bates reported struggling to form words. (*Id.*). Bates also reported increased swelling in both her legs and struggles with balances. (*Id.*). She was ambulating with a cane. (*Id.*). On examination, Dr. Davis noted normal range of motion, without tenderness, 2+ pitting edema on the bilateral lower extremities without redness, warmth, or calf tenderness. (Tr. 1876). Dr. Davis ordered chlorthalidone 25 mg and a blood pressure cuff, and discharged Bates the same day. (Tr. 1875).

On January 2, 2025, Bates met with NP Eastek to evaluate her injuries following the December 22, 2024 fall. (Tr. 1329). Bates reported she hurt her right side during the fall. (*Id.*). NP Eastek noted back pain and gait problems, and added that Bates was using a cane. (*Id.*). On examination, NP Eastek noted a normal appearance, wheezing, and a normal range of motion. (Tr. 1332-33). NP Eastek ordered Levaquin 500 mg daily for 7 days, and continued Tessalon Perles and Zyrtec. (Tr. 1333).

On January 13, 2025, Bates followed up with PA Barros about neck, joint, and lower back pain. (Tr. 1143). Bates reported no improvement from injection therapy, and was currently having aching, burning, and sharp pain in her neck. (*Id.*). On examination, PA Barros noted a normal appearance, soft abdomen, and an antalgic gait with a cane. (Tr. 1145). PA Barros also noted midline tenderness, hyperalgesia with palpation of left traps and positive facet loading while examining Bates' cervical spine, and pain with palpation of facet joints and SI joints with hyperalgesia while examining Bates' lumbar spine. (*Id.*). PA Barros discussed the importance of exercise, therapy, and coping skills with Bates, provided 14 tablets for Tramadol to use sparingly

throughout the month, provided 30 tablets of ibuprofen to be used as needed, and continued Tizanidine at night only. (Tr. 1147).

Bates established care with physical therapist Joana Waite on January 16, 2025. (Tr. 2194). Bates reported a tight neck for the past year, as well as pain and numbness in her arms down to her fingers. (*Id.*). Bates added that the pain runs from her neck down to her lower back. (*Id.*). Waite wrote, "[Bates] is walking with a straight cane." (*Id.*). Bates also reported requiring extra time to bathe, feeling pain when carrying a gallon of milk with two hands, avoiding stairs, needing to steady herself while bending forward, and having difficulty with transitional activities. (*Id.*). On examination, Waite noted "High reactivity and Moderate restriction of the posterior mid to lower cervical spine and paraspinals, upper trap/levator scap/rhomboids L>R, pectoralis minor and scalenes bilaterally, and thoracic paraspinals. (Tr. 2195). Waite stated that it was their professional opinion that Bates required "skilled physical therapy" and "a home exercise program" to combat her conditions. (Tr. 2196).

On January 21, 2025, Bates had a telehealth psychotherapy appointment with LPCC-S Wolf. (Tr. 1415). Bates reported that she had made progress with household chores, but doing so was difficult and painful. (*Id.*). Bates also feared that her daughter would evict her from her home. (*Id.*). On examination, Wolf noted that Bates had an anxious mood and congruent affect. (Tr. 1416). Wolf again encouraged Bates to create a daily routine to complete household chores but allowed for time to sew. (*Id.*).

On February 6, 2025, Bates had a virtual rheumatology visit with PA-C Barile. (Tr. 1120). Bates reported pain in her neck and lower back and swelling in her feet. (Tr. 1121). She also reported morning stiffness lasting about an hour. (*Id.*). On examination, PA-C Barile noted that Bates was alert and appropriate, in no distress, and was able to make a tight fist with no

swelling. (Tr. 1123). PA-C Barile concluded that there was no evidence for active rheumatoid arthritis but noted that her underlying diagnosis may be fibromyalgia and degenerative arthritis, since Bates continued to have chronic pain, and that most of that pain is coming from the degenerative arthritis in her cervical and lumbar spine. (Tr. 1125). Barile added that Bates' carpal tunnel symptoms had improved in her left hand since the 2023 surgery. (*Id.*).

Bates had a psychotherapy appointment with LPCC-S Wolf on February 11, 2025. (Tr. 1426). Bates reported feeling overwhelmed and depressed but would feel better when moving or doing something with her hands. (*Id.*). Bates also brought several items she had sewn to the appointment. (*Id.*). On examination, Wolf noted that Bates appeared appropriately dressed, was in a tired mood, and her affect was mood congruent. (Tr. 1426-27). Wolf again encouraged Bates to create a daily routine to complete household chores but allowed for time to sew. (Tr. 1427).

On February 13, 2025, Bates had a virtual telehealth visit with NP Hartman. (Tr. 1109). Bates reported an urge to move her legs and excessive daytime sleepiness, was working on weight loss and sleep hygiene, and sewed to keep herself awake. (*Id.*). On examination, NP Hartman noted that Bates appeared well groomed and pleasant, and had normal mood, affect, and behavior. (Tr. 1112). NP Hartman recommended that Bates continue to work on weight loss and sleep hygiene, and continued Mirapex. (Tr. 1113).

On February 20, 2025, Bates met with NP Eastek for a follow-up appointment. (Tr. 1296). Bates reported that she was not sleeping well and that she would often fall asleep during the day. (*Id.*). Bates also reported a cough that she had been treating with Mucinex and cough medicine, and that she had abdominal pain, constipation, diarrhea, headaches, back pain, neck pain, and gait problems, for which she uses a cane. (Tr. 1296-97). On examination, NP Eastek noted Bates' normal appearance, slight redness in her right ear, moist mucous membranes, soft

abdomen, and a normal range of motion. (Tr. 1300). NP Eastek diagnosed Bates with acute recurrent sinusitis, and ordered azithromycin 500 mg on the first day, and then 250 mg for days 2-5. (*Id.*).

On February 24, 2025, Bates had a re-evaluation appointment with NP Demos for bipolar disorder and anxiety. (Tr. 1428). Bates reported that her sleep was improving but she was still falling asleep during the day. (*Id.*). Bates continued to struggle with anxiety, depression, and focus, but had now begun making impulsive purchases. (*Id.*). Bates again took the GAD-7 and PHQ-9 tests, and again exhibited severe anxiety symptoms. (Tr. 1429). On examination, Demos noted appropriate dress; sad, depressed, and anxious mood with congruent affect. (Tr. 1432-33). Demos also concluded that there was no evidence of acute risk of harm to self or others. (Tr. 1433). Demos continued Rexulti 1 mg daily for mood, Depakote ER 2000 mg daily, and Cymbalta 60 mg twice daily. (Tr. 1435).

On February 26, 2025, Jagan Devarajan, M.D., gave Bates a cervical epidural steroid injection due to her cervical radiculopathy. (Tr. 1134). Bates tolerated the procedure well and was discharged. (Tr. 1135).

Bates had a physical therapy appointment with Joanna Waite on March 10, 2025. (Tr. 2176). Bates reported neck pain caused by extra sewing over the weekend, which she could only do for about 5 minutes before needing to take a break. (*Id.*). Bates also reported avoiding stairs, needing extra time to shower, feeling pain when lifting a gallon of milk with two hands, needing to steady herself when bending forward, and needing to use her arms to transition between sitting and standing. (*Id.*). On examination, Waite noted "Mod reactivity and Mod restriction of the posterior mid to lower cervical spine and paraspinals, upper trap/levator scap/rhomboids L>R, pectoralis minor and scalenes bilaterally, and thoracic paraspinals." (Tr. 2177). Waite

recommended Manual Therapy Techniques, Electrical Stimulation, moist hot pack, stretching and flexibility activities, and home exercise programs. (Tr. 2180).

On March 20, 2025, Bates met with NP Eastek for evaluation of colitis, irritable bowel syndrome, asthma, and leg swelling. (Tr. 1547). Bates reported that she recently went to the emergency department following an episode of hematochezia, which she claims occurs frequently. (*Id.*). She was diagnosed while in emergency care with colitis, which was confirmed with a CT scan. (*Id.*). Bates also reported shortness of breath upon exertion, leg cramps, headaches, neck pain, dizziness, and blurry vision. (Tr. 1547-48). She also had a hernia. (Tr. 1548). On examination, NP Eastek noted tenderness throughout the epigastric and umbilical region, but Bates also had a supple neck without lymphadenopathy, her lungs were clear to auscultation, and no edema was noted. (Tr. 1551). NP Eastek determined that Bates' colitis, IBS, and bloody stool were chronic and unstable, but her asthma and depression were stable. (*Id.*). NP Eastek ordered Imodium 2 mg daily for a week, advised taking potassium supplements, mylanta, and omerprazole, and provided Bates with prescription compression socks for the edema. (Tr. 1552).

Bates followed up with PA Barros on April 8, 2025, to address her chronic pain. (Tr. 2164). Bates reported no improvement from either the sacroiliac joint injection or the cervical epidural steroid injection. (*Id.*). She also reported pain at a 9/10 level which worsened when she turned or stood. (*Id.*). She did not report numbness or tingling. (*Id.*). On examination, PA Barros noted a normal appearance, epigastric and midline tenderness, and hypermobility in elbows and hands but normal range of motion. (Tr. 2166). PA Barros also noted edema in both legs. (*Id.*). The examination further revealed diminished biceps and triceps, diminished grip, and interossei on the left, and an antalgic gait. (*Id.*). PA Barros emphasized the importance of exercise,

cognitive behavior therapy, and coping skills, ordered physical therapy and lidocaine infusion for pain, and provided Tramadol to use sparingly throughout the month. (Tr. 2167).

### C. Medical Opinion Evidence

#### 1. Agency Reviewing Opinion Evidence

On May 23, 2024, at the initial level, state agency reviewer Lynne Torello, M.D., concluded that Bates was not disabled, but provided no RFC, citing insufficient evidence as the basis. (Tr. 69). Likewise, on May 22, 2024, Jennifer Swain, PsyD, made no mental RFC opinion due to insufficient evidence. (Tr. 68).

On September 25, 2024, state agency reviewer Steve McKee, M.D., opined that Bates could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (Tr. 77). Regarding standing and sitting, Dr. McKee determined that Bates could stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. (*Id.*). Further, Dr. McKee concluded that Bates could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.*). Dr. McKee added that Bates had no postural limitations regarding balancing, nor did he find any manipulative limitations. (*Id.*).

At the reconsideration level on September 17, 2024, Aracelis Rivera Castro, PsyD, determined that Bates could perform work that involves superficial public and coworker interaction, but that such work could not involve strict productions quotas and required infrequent, clearly explained changes. (Tr. 79-80).

#### 2. Treating Source Opinion Evidence

On April 8, 2025, PA Barros completed a Physical Medical Source Statement. (Tr. 2171-74). In it, PA Barros listed Bates' symptoms as "widespread pain, debility, fatigue, lower extremity edema," (Tr. 2171), and identified depression and anxiety as psychological conditions

affecting Bates' physical condition, but noted that "further determination to be discussed with mental health provider." (Tr. 2172). PA Barros also concluded that Bates could sit no longer than 2 hours with repositioning and could only stand for 10 minutes at a time. (*Id.*). PA Barros determined that Bates would need to take breaks during a workday due to muscle weakness, chronic fatigue, lower extremity edema, and pain; the length and frequency of these breaks was dependent on Bates' fibromyalgia. (*Id.*). Additionally, PA Barros determined that Bates would need to have her leg elevated above the umbilicus for at least 70% of an 8-hour workday. (Tr. 2173). Bates would also need a cane as necessary due to imbalance, pain, weakness, and insecurity. (*Id.*). As a result, PA Barros concluded that Bates would be off task over 25% of a workday and would need to be away from work more than four days a month. (Tr. 2174).

**D. Administrative Hearing Evidence**

On April 17, 2025, Bates testified before the ALJ. (Tr. 43). Bates testified that if she stood for longer than 10 minutes, her feet and ankles would go numb, and if she sat for longer than 10 minutes, her feet and ankles would swell up. (Tr. 51). She also testified that she would fall asleep if she sat for 10 minutes, due to "narcolepsy." (*Id.*). Bates was forbidden from driving for more than 15 minutes because of this sleep disorder, and she accordingly required assistance from friends and family to travel. (Tr. 51, 56). According to her, the longest Bates can stay awake is an hour. (Tr. 56).

Bates testified to having pain in her neck that radiates down into her arms, causing more discomfort in her left arm than in her right arm. (Tr. 51-52). Bates also described struggles using her hands, testifying that she quit doing the dishes after dropping too many, and removing buttons and zippers from her wardrobe. (Tr. 52). She testified further to occasionally needing assistance with housework and getting dressed. (Tr. 52-53, 55).

Bates testified to her mental health as well. (Tr. 54-55). Bates testified to seeing Diana Wolf of Natura Behavioral Health one to two times a week. (Tr. 54). She also sees a case manager through Renewing Hope, who helps Bates manage her anxiety and provides assistance with household tasks. (Tr. 54-55).

Bates testified that she was prescribed a cane. (Tr. 53). She said that it inhibited her ability to do housework, and she needed it for getting up from a seated position, standing, and walking. (*Id.*). Bates testified to needing handrails to use stairs. (*Id.*). When she goes to the grocery store, Bates claimed to use "the motorized buggies." (Tr. 56).

The VE then testified. (Tr. 57-62). The ALJ posed the following hypothetical:

> assume an individual of the claimant's same age, education and work experience. This hypothetical individual is able to perform light work as defined by the regulations, except they can occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl. They can never climb ladders, ropes, or scaffolds. They can occasionally reach overhead with the bilateral upper extremities. They can frequently handle, finger, and feel with the bilateral upper extremities. No work in high, exposed places. No work in proximity to moving mechanical parts. No driving or operating heavy machinery or equipment. No commercial driving. The individual can perform work without a specific production pace, so no assembly line work, or work requiring hourly quotas. The individual can occasionally interact with supervisors and coworkers and the public. However, interactions with others should be superficial, which I'm going to define as no tandem or collaborative work, no work that would involve sales, negotiation, persuasion, conflict resolution, directing or supervising. And the individual could deal with occasional changes in the routine work setting.

(Tr. 58). The VE testified that there was work in the national economy that this hypothetical person could do, including a marker, DOT #209.587-034, SVP 2, light, with 59,000 jobs in the national economy; garment sorter, DOT #222.687-014, SVP 2, light, with 23,000 jobs in the national economy; and a router, DOT #222.587-038, SVP 2, light, with 34,000 jobs in the national economy. (Tr. 58-59).

The ALJ then posed a second hypothetical in which everything was the same, but the individual could stand only for four of the eight-hour workday. (Tr. 59). The VE determined that this person could work the same three jobs as before. (*Id.*).

The ALJ then posed a third hypothetical:

> Assume an individual of the claimant's same age, education, and work experience. This hypothetical individual is cable of performing sedentary work as defined by the regulations, except they can occasionally climb ramps and stairs, occasionally stoop, kneel, crouch and crawl. Never climb ladders, ropes, or scaffolds. They can occasionally reach overhead with the bilateral upper extremities. They can frequently handle, finger, and feel with he bilateral upper extremities. No work in high, exposed places. No work in proximity to moving mechanical parts. No driving or operating heavy machinery or equipment. No commercial driving. This individual can perform work without a specific production pace, so no assembly line work or work requiring hourly quotas. The individual can occasionally interact with supervisors, coworkers in the public. However, interactions should be superficial, which I'm going to define as no tandem or collaborative work, no work that would involve sales, negotiation, persuasion, conflict resolution, directing or supervising. And this individual could deal with occasional changes in the routine work setting.

(Tr. 59-60). The VE testified there were jobs in the national economy for this person, including a final assembler, DOT #713.687-018, SVP 2, sedentary, with 19,000 jobs in the national economy; stuffer, DOT #731.685-014, SVP 2, sedentary, with 18,000 jobs in the national economy; and ink printer, DOT #652.685-038, SVP 2, sedentary, with 16,000 jobs in the national economy. (Tr. 60).

The ALJ posed one final hypothetical, in which everything was the same as hypothetical three, except that person would need a cane to ambulate. (*Id.*). The VE determined that this person could still perform the earlier three jobs, even with a cane. (Tr. 60-61).

The VE further testified that employers tolerate, at most, one absence per month. (Tr. 61). Additionally, an extra unscheduled 15-minute break on top of two 15-minute breaks and a 30-minute lunch would require accommodation. (*Id.*). Otherwise, it would be work preclusive. (*Id.*).

Bates' counsel then posed a series of hypotheticals to the VE. (Tr. 62). The VE testified that the requirement of a cane for both standing and ambulation would be work preclusive to any of the hypotheticals posed by the ALJ. (*Id.*). If that person did not need a cane, but needed to elevate their legs 70% of the day, the VE concluded there would be no jobs for that person. (*Id.*). Finally, if instead of frequently handling, fingering, and feeling, a person could only occasionally handle, finger, and feel, the VE determined there would be no jobs for that person. (*Id.*).

## IV. The ALJ's Decision

In her May 5, 2026 decision, the ALJ found the following:

> 1. The claimant has not engaged in substantial gainful activity since January 12, 2024, the application date (20 CFR 416.971 et seq.).
>
> 2. The claimant has the following severe impairments: obesity, high blood pressure, obstructive sleep apnea/insomnia/hypersomnia/chronic fatigue [hereinafter, collectively, the "sleep disorder"], carpal tunnel syndrome, status-post release surgery on left hand, lumbosacral spondylosis/facet arthritis/cervical disc disease/spondylosis/radiculopathy/severe foraminal narrowing at the C5-6 joint [hereinafter, collectively, the "spine disorder"], fibromyalgia, rheumatoid arthritis, generalized arthritis, anxiety disorder, unspecified, depressive disorder-not elsewhere classified, post-traumatic stress disorder, bipolar disorder, and chronic pain (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs but may never climb ladders, ropes, or scaffolds; the claimant may occasionally reach overhead with the bilateral upper extremities and may frequently handle and finger with the bilateral upper extremities; the claimant may not work in proximity to moving mechanical parts, must avoid all exposure to high exposed places, driving, commercial driving, and operation of heavy machinery or equipment; the claimant is able to work in a setting free of specific production rate pace [as is found in assembly line work or work imposing hourly quotas], which setting requires no more than occasional and superficial [defined as precluding tandem or collaborative tasks, as well as

tasks involving sales, negotiation, persuasion, conflict resolution, the direction of, or supervision of, others] interaction with co-workers, supervisors, or the public, which setting is routine, in that it contemplates few changes.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March 3, 1980, and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 12, 2024, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-34).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

In her brief, Bates raised the following issues for the Court's review:

1. The ALJ erred when she failed to support her conclusion or discuss supportability and consistency when she evaluated the opinion of the treating source.

2. The ALJ's finding that the Plaintiff did not require the use of a cane was not supported by substantial evidence and was contrary to Social Security Ruling 96-9p.

3. The ALJ committed harmful error when she failed to properly apply criteria of Social Security Ruling 16-3p.

(ECF Doc. 10, p. 1). Bates's arguments will each be addressed in turn.

### A. The ALJ failed to support her conclusion that PA-C Barros' medical opinion was wholly unpersuasive.

Bates argues that the ALJ erred when she found PA Barros' medical opinion wholly unpersuasive because the ALJ failed to support her conclusion and failed to address supportability and consistency when evaluating that opinion. (ECF Doc. 10, p. 13). Bates alleges

the ALJ incorrectly determined that her edema was chronic, and failed to consider whether it was a waxing and waning symptom. (ECF Doc. 10, pp. 13-14).

The Commissioner responds by arguing that the ALJ did in fact explain why the opinion was not supported by the record and addressed the opinion's consistency with the rest of the record. (ECF Doc. 11, pp. 3-6).

In determining how persuasive a medical opinion is, an ALJ will discuss the opinion's supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). To determine supportability, the ALJ will look at the objective evidence cited by the medical source. 20 C.F.R. § 404.1520c(c)(1). The more relevant this objective evidence is to the medical source's opinion, the more persuasive the opinion is. *Id.* When considering consistency, the ALJ will find a medical opinion more persuasive if it is consistent with the rest of the record. 20 C.F.R. § 404.1520c(c)(2).

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Rather, the ALJ should provide "good reasons in the opinion—not an exhaustive factor-by-factor analysis." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (internal quotations and marks omitted). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").

However, an ALJ improperly "cherry-picks" evidence when their decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why she chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405, at *13 (N.D. Ohio Apr. 24, 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination). An ALJ goes beyond cherry-picking, and starts to mischaracterize the record when they selectively consider evidence that supports a conclusion of not disabled. *See Delgado v. Comm'r of Soc. Sec.*, No. 1:24-CV-831, 2025 WL 418222, at *11 (N.D. Ohio Feb. 6, 2025) ("[C]ourts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light."); *see also Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

And while an ALJ can favor certain evidence, they must explain why they are doing so "sufficiently for the claimant and a subsequent reviewer to follow," and cannot go so far as to substitute their own judgment for that of a medical provider's. *Kilgore v. Comm'r of Soc. Sec.*, No. 5:26-cv-02530-RJS, 2026 WL 3056877, at *14-15 (N.D. Ohio Oct. 13, 2026). The ALJ must do this to ensure they have built the necessary logical bridge to support their conclusion. *See Russ v. Comm'r of Soc. Sec.*, No. 1:20-cv-1838, 2021 WL 3709916, at *9 (N.D. Ohio Aug. 20, 2021) ("But the ALJ also was required to give a 'coherent explanation for his reasoning'

sufficient to allow us to understand how the ALJ arrived at his conclusion and conduct meaningful judicial review." (internal citations omitted)).

Here, the ALJ found PA Barros' medical opinion to be wholly unpersuasive because it was not consistent with nor supported by the evidence in the record. (Tr. 31). The ALJ wrote the following:

> The claimant's pain management provider, Sabrina Barros, PA, indicated, on April 8, 2025, that the claimant could sit for two of eight hours and could also sit for more than two hours at a time with re-positioning [sic.], that she could stand and/or walk for less than two of eight hours in increments of no more than ten minutes, that she would need unscheduled breaks [but was unable to offer further guidance], that she would need to elevate her legs above the umbilicus seventy-to-eighty percent of the day, that a cane was medically necessary, that she would be off task twenty-five percent or more of the time and absent four days per month. Ms. Barros has treated the claimant since November of 2024 and declined to certify that these limitations were in place prior to that time. She is reporting within the bounds of her professional certifications. However, the evidence shows that the claimant typically presents for treatment as and when appointed and is able to participate fully in her own treatment and planning. There is no real objective basis for the opinions on off-task behaviors or absenteeism. Ms. Barros asserts that psychological disorders also contribute to the limitations suggested but defers further explanation in favor of a psychological provider (24F/2, 4). She would not comment on exertional or postural limitations. As noted previously, edema, the stated reason for elevation of legs, is not severe as it is not demonstrated as chronic (12F/41), (15F/33), (22F/6). In addition, and by comparison to the overall evidence of record, described in the preceding paragraph, and in the paragraph following, this opinion is not consistent with, or supported by, the evidence of record. For all of these reasons, this opinion is not persuasive

(*Id.*). Since the ALJ discussed supportability and consistency, she met 20 C.F.R. § 404.1520c standards. However, in doing so, the ALJ failed to build the necessary logical bridge to support her conclusion. *See Russ*, 2021 WL 3709916, at *9.

The ALJ concluded that Bates' edema was not severe, and claimed to have considered this non-severe impairment in Bates' RFC. (Tr. 20). However, the ALJ does not clearly explain how she considered Bates' edema during her RFC assessment, nor does she explain how it being non-severe conflicts with PA Barros' opinion that Bates needs to elevate her leg. (Tr. 31). In

failing to explain this conflict, it is as if the ALJ made an independent determination that leg elevation was unnecessary to treat Bates' edema, substituting her judgment for that of a medical provider. *Kilgore*, 2026 WL 3056877, at *15.

Nor did the ALJ explain why she relied on only certain parts of the record, and accordingly, did not resolve conflicts between the RFC, the record, and PA Barros' opinion. While the ALJ noted that these findings were not "universally" reported, (*see* Tr. 25), she did not directly address the fact that numerous providers noted that Bates presented with an antalgic gait, (Tr. 952, 1145, 2166), or a "stressed gait." (Tr. 395, 413, 369, 996). And because the ALJ did not directly address this evidence, she did not clearly explain why she disfavored, thus appearing to mischaracterize the record in such a way as to place Bates "in a capable light." *Delgado*, 2025 WL 418222, at *11.

And by failing to clearly resolve these conflicts, the ALJ failed to build the logical bridge necessary to explain why PA Barros' opinion was unpersuasive. *See Russ*, 2021 WL 3709916, at *9. PA Barros relied on Bates' history of edema and her imbalance as evidence to conclude that Bates required significant time away from work and a cane for balance. (*See* Tr. 2171-74). This evidence stands in stark conflict with the evidence relied on by the ALJ, but she does not clearly resolve this conflict in her decision. Again, an ALJ can favor certain evidence, but they must explain why they are doing so "sufficiently for the claimant and a subsequent reviewer to follow," and the ALJ failed to do that here. *Kilgore*, 2026 WL 3056877, at *15.

While the ALJ may have had reason for finding PA Barros' opinion is wholly unpersuasive, she failed to explain clearly and sufficiently why she did. Therefore, her conclusion that PA Barros' medical opinion is wholly unpersuasive does not have the support of substantial evidence.

**B. The ALJ's failure to provide adequate reasoning under SSR 96-9p regarding Bates' cane warrants remand.**

Bates next asserts that the ALJ erred when it determined her cane was not medically necessary. (ECF Doc. 10, p. 16). Bates argues that the ALJ failed to include necessary limitations in the RFC relating to the necessity of her cane. Bates therefore asserts that, contrary to SSR 96-9p, the ALJ failed to consider the totality of Bates' symptoms and limitations when forming the RFC and thus failed to support it with substantial evidence. (*Id.* at p. 17).

The Commissioner counters by arguing that the elements of SSR 96-6p were not met, so there was substantial evidence to support the ALJ's determination that the cane was not medically necessary. (ECF Doc. 11, p. 6). The commissioner asserts that PA Barros' opinion that Ms. Bates needed a cane was not a prescription, but even if it was, it did not describe the circumstances for which it was needed. (*Id.* at 6-7).

SSR 96-9p states, in relevant part:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996).

Here, the ALJ failed to support its conclusion with substantial evidence because she failed to follow Agency regulations in determining the cane was not medically necessary. SSR 96-9p lays out a clear two-step analysis for ALJ's to follow. First, the ALJ must determine whether there is medical *documentation* establishing a need for the assistive device. SSR 96-9p,

1996 WL 374185 (S.S.A. July 2, 1996) (emphasis added). And second, the ALJ must determine whether the documentation describes "the circumstances for which it is needed." *Id.*

However, the ALJ did not apply this two-step framework, and did not reference SSR 96-9p at all. Instead, the ALJ determined the cane was not medically necessary while evaluating listings 1.15, 1.16, and 1.18. (Tr. 20). The ALJ noted that PA Barros certified that the cane was necessary, and that Bates would arrive at appointments using it. (*Id.*). However, the ALJ ultimately concluded that the cane was not medically necessary because Bates' gait was occasionally normal with it, and that Bates would arrive at appointments without it. (Tr. 20-21). This analysis, however, does not follow the requirements of SSR 96-9p. And because the ALJ deviated from the SSR 96-9p analysis, she failed to support her conclusion with substantial evidence.

Applying this two-step framework, Bates' cane may be medically necessary as described in SSR 96-9p. First, PA Barros determined that Bates needs a cane, and documented it in her Medical Source Statement. (Tr. 2173). And, despite what the Commissioner asserts, SSR 96-9p does not require a medical prescription, but rather, "medical documentation." SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996); *see also Krieger v. Comm'r of Soc. Sec.*, No., 2019 WL 1146356, at *5 (S.D. Ohio March 13, 2019) ("Plaintiff correctly points out that a hand-held assistive device need not be prescribed to be found medically necessary."). Thus, step one appears satisfied.

It appears that step two is met, as PA Barros described the circumstances for which the cane is needed: "as needed." (Tr. 2173). SSR 96-9p lists "periodically, or only in certain situations" as examples of descriptions of when the cane would be medically necessary. SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996). "As needed" is language similar to those two

phrases, and therefore likely satisfies the regulation. PA Barros also determined the cane was necessary for imbalance, pain, weakness, and insecurity, further describing the circumstances for which the cane is needed. (Tr. 2173).

In all, because the ALJ failed to follow SSR 96-9p to assess the medical necessity of Bates' cane despite having supporting documentation in the record, the ALJ failed to follow Agency regulations, which warrants remand. I therefore remand this case back to the Agency for the ALJ to consider whether Bates' cane is medically necessary in accordance with SSR 96-9p.

### C. It is unnecessary at this time to reach Bates' Social Security Ruling 16-3p issue.

Because the other two issues regarding PA Barros' medical opinion and Bates' cane are dispositive and the matter requires remand, I do not reach Bates' third issue on whether the ALJ failed to properly consider Social Security Ruling 16-3p.

## VII. Conclusion

Because the ALJ failed to follow regulations and reach a conclusion supported by substantial evidence, the Commissioner's final decision denying Bates' application for SSI is vacated and her case remanded for further consideration.

Dated: November 23, 2026

Reuben J. Sheperd
United States Magistrate Judge